Filed 2/28/23  Kazminy v. Dignity Health CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| MANDY KAZMINY, | C091802 |
| Plaintiff and Appellant, | (Super. Ct. No. CV-2016-1989) |
| v. | |
| DIGNITY HEALTH, | |
| Defendant and Appellant. | |

Defendant Dignity Health (Dignity) terminated plaintiff Mandy Kazminy's employment as the pharmacist-in-charge of the outpatient pharmacy at its hospital in Woodland.  Plaintiff brought this action, and the jury found for her on causes of action for retaliation under Labor Code section 1102.5, subdivisions (b) and (c), and for wrongful discharge in violation of public policy.  The jury found for Dignity on plaintiff's cause of action for discrimination under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq. (FEHA)), but not before finding that plaintiff's national

1

origin was a substantial motivating reason for her termination. The jury awarded plaintiff $1,032,511 in compensatory damages and $2.4 million in punitive damages.

The trial court awarded plaintiff attorney fees under FEHA, but on motions for judgment notwithstanding the verdict (JNOV) and new trial, it reduced the award of punitive damages to $1,032,004, rendering the total damages award to $2,064,515.

Both parties appeal. Dignity contends substantial evidence does not support the verdicts on the three causes of action found for plaintiff and asks us to direct judgment in its favor. Alternatively, Dignity contends we should direct partial judgment for it on plaintiff's claim for punitive damages as not supported by the evidence, and we should order a new trial due to instructional error, evidentiary error, and the excessiveness of the award for future economic damages. Dignity also contends plaintiff is not entitled to attorney fees under FEHA.

Plaintiff attacks the trial court's reduction of the punitive damages. She contends the court erred procedurally by reducing the award on a motion for new trial and by not stating the grounds for its decision in a written order. Plaintiff also contends the trial court erred in reducing the award, claiming the amount was not excessive and did not exceed the constitutional maximum amount.

We reverse in part and affirm in part. We reverse the judgments on plaintiff's causes of action under Labor Code section 1102.5, subdivisions (b) and (c) as not supported by the evidence and direct judgment be entered on those causes of action in favor of Dignity. This renders Dignity's claim of instructional error moot. We affirm the judgment in plaintiff's favor on her cause of action for wrongful discharge in violation of public policy.

We reverse the award of punitive damages as not supported by the evidence. This renders plaintiff's appeal moot. We order a new trial on compensatory damages due to prejudicial evidentiary error and the excessiveness of the economic damages award. We affirm the award of attorney fees.

2

1.      The outpatient pharmacy

In March 2014, Dignity discovered that the outpatient pharmacy at Woodland Memorial Hospital was missing 20,000 hydrocodone pills.  At that time, Wayne Dallas was the outpatient pharmacy's pharmacist-in-charge and Denise Foreman supervised him as the director of pharmacy.  She also was the pharmacist-in-charge for the hospital's inpatient pharmacy.  Foreman reported the discrepancy to the state Board of Pharmacy, which began investigating the matter.  Dignity also had a private auditor investigate the matter.

Foreman learned that, in addition to the missing pills, Dallas's employees were sharing passwords for ordering controlled substances and for accessing the computer system.  Dallas's recordkeeping also was in disarray, which made it difficult to determine the cause of the narcotic inventory discrepancy.  Dignity terminated Dallas's employment.

Dignity determined that its computer system and its software, known as Cerner-Etreby, was not correctly reporting inventory.  The computer miscalculated the on-hand inventory "all the time."  Due to a "glitch," the system would not deduct an actual prescription out of inventory until an unknown later time.

Dignity appointed an outpatient pharmacist, Lydia Winter, to serve as interim pharmacist-in-charge of the out-patient pharmacy.  Foreman testified that Winter established a paper log, referred to as a perpetual log, for keeping track of narcotic inventory, and she and her staff would correct the computer record to match the actual count if there was a discrepancy.  However, Ernie Santos, a pharmacy technician, testified there was no paper or perpetual log prior to plaintiff's employment.

Winter declined the invitation to apply for the job of outpatient pharmacy pharmacist-in-charge.  Another outpatient pharmacist, Steve Plummer, agreed to fill the

3

position on an interim basis.  He had served in that position prior to Dallas.  He pushed Foreman to recruit actively for a permanent hire, and he stated he would not oversee the day-to-day management of controlled substances while he was the interim pharmacist-in-charge.

### 2. Plaintiff employed as outpatient pharmacy manager

In 2014, plaintiff, a pharmacist and native Iranian, managed a pharmacy in San Jose.  A Dignity recruiter contacted her about the employment opportunity in Woodland.  Interested, she traveled to Woodland and met with Dr. Mitesh Patel, the hospital's chief medical officer, and Foreman.  The interview went well.  No one from Dignity mentioned any specific challenges the pharmacy was facing other than not having had a pharmacist-in-charge for a while.  Nor did anyone tell plaintiff she would have a probationary period if she accepted the position.

On October 1, 2014, Dignity formally offered plaintiff the position of outpatient pharmacy manager and pharmacist-in-charge, and plaintiff accepted two days later.  Her annual salary was $169,520, and she would report directly to Foreman.  Her employment was at-will.  She started her employment sometime between the 1st and 7th of November 2014.

Plaintiff attended a new employee orientation on November 3.  Toward the end of the orientation, the instructors gave a PowerPoint presentation.  They could not complete the presentation, so they gave the attendees a large book and said the employees could read it.  The instructors asked the employees to initial that they attended the orientation and read everything, although there was no time to read everything.

Plaintiff signed and initialed a new employee orientation checklist on the date of the orientation.  The orientation covered numerous topics, including the "HIPPA/HiTech & Network Usage Policy."  The training materials included policies regarding employee use of patient health information as regulated by the Health Insurance Portability and

4

Accountability Act (HIPAA) (Pub.L. 104–191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.) and use of Dignity's computer network.  Plaintiff acknowledged that the information listed in the checklist was presented to her at the orientation.  She knew that by signing the checklist, she certified she would comply with the training and Dignity's policies.  The orientation period for new employees was six months, during which employment could be terminated without cause.

       3.      <u>Plaintiff</u> <u>discovers</u> <u>and</u> <u>reports</u> <u>problems</u> <u>with</u> <u>the</u> <u>pharmacy</u>

State regulations require a new pharmacist-in-charge to complete an assessment of the pharmacy's compliance with federal and state pharmacy law, known as a Hospital Outpatient Pharmacy Self-Assessment, and to report her review on a specific form.  The parties refer to this assessment as a PIC assessment.  The assessment helps a new pharmacist-in-charge determine if anything needs to be remedied in the pharmacy.

Plaintiff completed the PIC assessment and signed it under penalty of perjury on November 9, 2014.  Of relevance here, in the assessment, plaintiff answered "yes" that pharmacists provide oral consultations to patients when required by law.  She also answered "yes" that the pharmacy was secure and only a pharmacist possessed a key.  The pharmacy also had provisions for effective control against the theft of dangerous drugs and devices.

Plaintiff stated in the PIC assessment that the pharmacy completed an inventory of controlled substances biennially, and that she completed an inventory on November 9, 2014.  She answered "yes" that the inventories complied with all legal requirements.  Any loss of controlled substances was reported upon discovery to the DEA and within 30 days of discovery to the Board of Pharmacy.

Foreman signed the PIC assessment on November 18, 2014, certifying under penalty of perjury she had read and reviewed it.  Dignity then submitted the assessment to the state Board of Pharmacy.

5

As plaintiff performed the inventory of controlled substances on November 9, she realized the computer system's inventory of controlled medications was not consistent with her actual count. The discrepancies between the computer record and plaintiff's actual count were significant, such as a difference of 500 tablets of codeine and 300 of Oxycodone. Approximately 20 different types of controlled substances had discrepancies. The discrepancies scared her. Any discrepancies in the numbers of controlled substances under her management as the pharmacist-in-charge could affect her pharmacist license.

Plaintiff decided not to use the computer's inventory record going forward. She created a paper perpetual log to maintain the actual count of medications in stock. She also contacted Foreman that day by telephone, informing her she could not "sign off this paperwork" because the computer record "is completely off," and the discrepancies would be under her license. She would use just her paper log and not the computer inventory.

Foreman was upset and asked plaintiff to change the computer's inventory numbers to match her paper log. Plaintiff believed changing the computer's numbers was wrong and illegal, and she refused to do it. The computer would show that the change had been made, and the licensing authorities would ask where the pills went. The discrepancy would still exist if she did not change the computer inventory, but it would not be attributed to her license.

The next morning, November 10, plaintiff created the paper inventory log and showed it to Foreman. Foreman was upset about it and told plaintiff this was not her job. She said the hospital had the software. Plaintiff had to follow whatever the computer system was asking and initial the count on the computer. Plaintiff replied that Foreman was asking her essentially to lie about the number of prescriptions that had been dispensed and the quantity she had on hand. Foreman reminded plaintiff that she was her boss and this was what she wanted her to do.

6

Plaintiff was upset that Foreman would force her to put her license on the line. She did not change the computer inventory and went ahead using the paper log she had created. She told her pharmacy team they needed to follow that log and she trained them how to use it. Most of the pharmacists welcomed the paper log because they felt more comfortable using it.

Two of the pharmacists, Plummer and Winter, resisted changing to the paper inventory. When plaintiff complained to Foreman about their resistance, Foreman told her not to worry about it and asked why she did not record the inventory on the computer the way it was before. The paper log did create more work for the pharmacists, so plaintiff requested many times that the hospital's IT department hire more workers and change the software system.

Plaintiff reported her November 10 conversation with Foreman to Patel. She explained that Foreman was asking her to manipulate the computer inventory and that she had determined to use a paper inventory. Patel liked and supported her idea to use a paper inventory and gave her a lot of praise. Plaintiff later told Foreman that she had spoken with Patel. Foreman was "not happy at all."

During plaintiff's entire employment, there was no discrepancy with her paper log. As the pharmacist in charge, she had to do an inventory monthly, and every month she would have the difficult conversation with Foreman about not changing the numbers in the computer.

Plaintiff observed other problems in the pharmacy during her first weeks of employment. There was no structure to the workflow and jobs that needed to be done. As a result, prescriptions were being filled incorrectly, an act plaintiff referred to as a misfill. There was no filing system in place. Expired medications were on the shelf with no one responsible for them. Prior authorizations for patient prescriptions were not being done. Patient consultations were not occurring as required. There was no control on how long employees took for lunch or breaks, and overtime was extremely high. Customers

7

complained of long wait times. The pharmacy also did not have activated security cameras.

No one informed plaintiff that these issues existed with the pharmacy. Plaintiff realized within a week or two of starting her employment that the pharmacy was not normal and needed a lot of work. She testified that each of these issues were related to patient safety. She reported the issues to Foreman by email when she noticed them or in person in meetings. Foreman would ignore plaintiff and tell her the issue was not her responsibility or to do just what she asked her to do. During her first month of employment, plaintiff complained to Foreman several times and to Patel about these issues. Neither did anything to address them.

4.    Surprise inspection

On December 10, 2014, about one month after plaintiff began her employment, an inspector from the Board of Pharmacy audited the pharmacy unannounced. The inspector observed, among other things, that Plummer was screening for consultations (i.e., asking a patient if she wanted to consult with a pharmacist instead of telling her the pharmacist would consult with her), and he was not informing pharmacists that patients needed consultations, in violation of state regulation. The inspector issued a written notice for this violation. She could have imposed a fine, but she did not due to plaintiff's short tenure as the pharmacist-in-charge. However, the notice was to remain in plaintiff's personal pharmacy record for five years.

The inspector also informed plaintiff that the Board of Pharmacy was already investigating the pharmacy's inventory discrepancies. The inspector stated that thousands of pills were missing from the pharmacy. The prior pharmacist-in-charge was fired because of the discrepancies. As stated earlier, Dignity, through Foreman, had initiated the investigation by reporting the discrepancies. Plaintiff did not know this

8

investigation was happening, nor did she know that her predecessor had been fired because of the discrepancies.

During the inspection, plaintiff attempted to contact Foreman. She received no response, and Foreman did not show up to be present during the inspection. Plaintiff attempted to contact Foreman afterward but again could not make contact. Because she could not contact Foreman, plaintiff on December 12, 2014, sent an email to Foreman, Patel, and hospital president Kevin Vaziri to inform them of the inspector's findings, including the written citation to be placed in her file.

In a return email sent 10 minutes later, Patel apologized to plaintiff for not appreciating the gravity of the inspector's citation as it related to her. He asked her to help him better understand the situation going forward so he could support her work.

Thirty minutes after plaintiff sent out her email, Patel also visited plaintiff in her office. He again apologized and expressed his support of her. During the visit, plaintiff informed him she had learned in the inspection that the Board of Pharmacy was already investigating the pharmacy for discrepancies. Patel was aware of it. He knew about the discrepancies. He was not shocked by it.

By email later that day, plaintiff thanked Patel for the visit. She stated that "this matter" concerned her the most "because the prior managements including Denise [Foreman] and both interim PIC pharmacists [Plummer and Winter] knew about the lack of consultations and nothing was done." At trial, plaintiff testified that when she reported this about Foreman and the interim pharmacists-in-charge to Patel, she believed she was reporting them for noncompliance with the law. She feared retaliation for making the report, afraid that Foreman would "make my life miserable."

In the same email to Patel, plaintiff stated she appreciated his trust in her leadership moving forward. The next morning, Patel responded by email. He stated, "Trust is a precious commodity. Denise [Foreman] has little experience in pharmacy and [] the others were traumatized without strong leadership. The reason you are in the

9

manager role is because of your experience and leadership strength to make needed changes. The level of fear in your shop is significant and everyone is wondering who is next to be fired. Please help reduce the fear. [I]t is not productive and undermines teamwork. In time, you will trust me an[d] Denise. We chose to have some begin [*sic.*, benign] neglect for the greater good until you could help lead change. The team is in a fragile state and WE need to give them strength."

Foreman also responded to plaintiff's summary of the audit. By email on December 12, she asked plaintiff for information about the discrepancies between the computer record and the perpetual log regarding several specific drugs, as well as the invoices for those drugs over a certain time period.

By email to plaintiff and Patel in the early hours of December 13, Foreman said she had spoken with the Board of Pharmacy's inspector and confirmed that a tech had not performed the required consultation. The issue would be on the retail license and on plaintiff's license. The inspector believed any discipline ultimately imposed against plaintiff would not be formal due to plaintiff's having just started the job. Once the Board issued its decision, plaintiff and the hospital could contest and negotiate for a lighter discipline. Plaintiff ultimately received the five-year citation, but the fine was waived.

Plaintiff gave Plummer verbal counseling as discipline for screening for consultations. She attempted to write up Plummer, but Foreman instructed her to give verbal counseling. Plaintiff wanted to write him up because it was "a big issue" and not just because of the effect on her license. She had mentioned the problem multiple times since her start date, and the Board of Pharmacy audit mentioned it, "so it wasn't something that no one was aware of it. They knew about it, and he was a pharmacist-in-charge before that."

In December 2014, plaintiff met with the hospital's director of human resources, Ricky Russell, to complain about Foreman. She gave Russell a list of her grievances and

10

explained them to him.  Among other complaints, she believed that Foreman was not reporting discrepancies to the Board of Pharmacy.  She also told Russell that Foreman was asking her to change the controlled substances inventory.  Russell said he would meet with Foreman and Patel and address her concerns.  Plaintiff told Russell she feared Foreman would retaliate against her for speaking with him.

### 5.    National origin animus

In December 2014, plaintiff asked Patel directly to hire more staff for the pharmacy.  Afterward, Foreman came into plaintiff's office and told her, "You Iranians are aggressive."

In mid-January 2015, a patient's complaint about long lines at the outpatient pharmacy reached hospital president Vaziri.  Plaintiff determined the long lines resulted from the pharmacists not doing their jobs properly.  Plaintiff particularly wanted to write up Plummer because he was not doing what he was supposed to do, and she had given him multiple verbal warnings.  Foreman refused her request to write him up, saying a conversation would be enough.  Plaintiff asked Foreman for additional staff to address the problem.  Referring to Vaziri, Foreman said, "Iranians are money oriented."

Plaintiff later asked Foreman by email if she could ask Patel to approve hiring one full-time tech for the pharmacy.  Two technicians were making many mistakes, and one of them was planning on taking maternity leave.

Days later, plaintiff went "over Ms. Foreman's head" and asked Patel by email to approve her hiring two full-time techs.  Responding, Patel asked plaintiff to review the situation with Foreman and he would accept her recommendation.

After receiving Patel's response, plaintiff emailed Foreman, saying Patel had approved hiring two techs if Foreman approved.  Slightly over an hour later, Foreman responded and approved hiring one full-time tech.  Later, however, Foreman called plaintiff and was very upset that plaintiff had gone directly to Patel with her request.

11

Foreman yelled at plaintiff, saying, "[Y]ou Middle Eastern women are very aggressive." Plaintiff tried to explain, but Foreman hung up.

Plaintiff complained that day to Russel in HR about Foreman's behavior. Foreman was commenting about plaintiff's race, and she was rude, disrespectful, and demeaning. Russell tried to calm plaintiff down and said he would investigate. He recommended she not have one-on-one meetings with Foreman anymore. He advised her to respect Foreman more, not to take it "personal," and to "[j]ust be sweet." He also directed her to visit HR representative Julie Stephens. Russell left Dignity in March 2015.

Plaintiff met with HR representative Stephens in February 2015. She told Stephens that Foreman was insisting she change the numbers in the computer even though they would create a discrepancy under her license. Stephens gave plaintiff no guidance other than to follow Russell's instructions. Stephens retired in March 2015.

Another pharmacist at the hospital, Mojeh Moradi, was also of Iranian descent. She began working at the hospital in 2012, and Foreman had been her supervisor for a time. Moradi believed Foreman singled her out for negative treatment. Foreman was punitive, meetings with her were demoralizing, and she used harsh language. At times, Foreman would say things like, "we pay you so much money, what are you doing for us with the money we give you," and that "you should be thankful that you have a job, that we give you a job."

For a time, Moradi noticed multiple times from her office that the outpatient pharmacists screened patients for consultations. She spoke with Plummer about it. Foreman later told Moradi she was not happy that Moradi had spoken with Plummer. Foreman knew screening was happening, and Moradi did not need to "mettle" [*sic*] in Foreman's business. It was not Moradi's place to speak with Plummer about the issue. Moradi noticed that the screening continued after Foreman had spoken with her.

12

Moradi thought Foreman might be singling her out because she was Iranian; otherwise, she could not understand why Foreman was so different toward her. Once, Moradi heard Foreman say something negative about hospital president Vasiri, and it related to him being Iranian. Another time, in a meeting with Foreman, Foreman said, "you people can get – think can get away with everything[.]"

When plaintiff complained to Moradi about Foreman's treatment of her, Moradi said Foreman treated plaintiff similarly to how she treated her, and it might be because she did not like them because they were Iranian. The only subordinates of Foreman who negatively criticized her management in writing were plaintiff and Moradi.

### 6. Winter violates password policy

Foreman had previously informed plaintiff that prior to the Board of Pharmacy's earlier investigation, pharmacy staff were using each other's passwords. In January 2015, both plaintiff and Foreman noticed that Winter had her passwords for every different system written on a Post-it note attached to her computer. Winter had done this before. Foreman asked plaintiff to speak with Winter about this. Plaintiff had done so numerous times already. She asked Foreman for permission to write up Winter, but Foreman said there was no need.

### 7. Relationship deteriorates

In February, Foreman began questioning plaintiff's attendance at work. Plaintiff sent Foreman an email stating she was working two Sundays a month to work on inventory, and on those weeks, she would take Fridays off. After plaintiff sent this email, Foreman told plaintiff she was confused about when plaintiff was supposed to work.

The next day, plaintiff sent an email to Patel and Foreman to clarify her work schedule. She stated she would work Mondays through Thursdays from 8-6 or until closing if needed. She would work two Sundays per month on inventory, and she would take two Fridays off in place of working the Sundays. She was available by email and

13

phone 24/7 no matter where she was. She sent this information to Patel because Foreman was telling him plaintiff was not at work.

Complying with Russell's direction to be sweet, plaintiff began addressing Foreman in her emails obsequiously. In a February 15 email to Foreman asking for time off for Persian New Year, plaintiff addressed Foreman as "my lovely boss." After Foreman approved the request, plaintiff wrote, "Awe u r the best! I love u:) u made me & all my family so happy:) Thanks soooooo much :)" A February 25 email addressed Foreman as "my lovely lady," and concluded with, "I really appreciate your support always. [¶] Take care of yourself and plan a vacation soon (you deserve it big time girl)." In addressing Foreman in this manner, plaintiff was being fake and was acting how she had been told.

8. Plaintiff shares password

In March 2015, Dignity began using a new payroll computer system known as TEAMS. Under the new system, if payroll was not approved timely, staff would not be paid. Plaintiff took vacation the week of March 16 to 20. The pay period ended on Saturday, March 21. Normally, she would approve payroll on the Friday prior to the next pay period, or in this instance Friday, March 20, but she would be on vacation that day. She asked Winter to approve the payroll in her absence.

Friday morning, March 20, Winter called plaintiff. Her log-in for approving payroll was not working and she did not know what to do. Plaintiff tried contacting Foreman several times, but Foreman did not answer. Plaintiff called Winter back, and Winter said if plaintiff did not approve payroll, the team would not be paid. Plaintiff texted her password and login to Winter to use, and she wrote in the text "Between us only pls ;)." Plaintiff knew password sharing was not something Dignity "wanted to see," but she gave Winter her password so her team would be paid on time.

14

Winter did not volunteer to Foreman that she had used plaintiff's password. One day, Foreman pulled Winter out of the pharmacy and asked if Winter had approved the timecards. Winter took that to mean Foreman already knew she had used plaintiff's password. Foreman gave Winter verbal counseling for having used her supervisor's password. Foreman asked Winter to send her an email explaining what had happened. Winter sent that email on April 9. She asked for confidentiality as she feared plaintiff would retaliate if she knew Winter had disclosed this.

9. Plaintiff texts patient information

Roughly two weeks after the payroll incident, on April 6, while performing her regular audit of controlled substances, plaintiff noticed the pharmacy had too few Ambien 10-milligram pills and too many Ambien five-milligram. That meant a misfill had occurred. Plaintiff looked at the prescription label that had been placed on the back of the last filed Ambien prescription to see who had initialed it as having filled it. The initial was not clear, so she asked everyone present if they were the ones who filled it. None of them said they were. Plaintiff called one of the pharmacists who had worked the day the prescription was filled, Karen Nijjar, but Nijjar said she did not fill the prescription. Using her personal cell phone, plaintiff photographed the initialed label and texted the photo to Nijjar. Nijjar called plaintiff and confirmed she had misfiled the prescription and given the patient 10-milligram pills instead of five-milligram. Plaintiff immediately contacted the patient and explained what had happened. She then delivered the correct prescription to the patient.

When plaintiff texted the photo, she did not believe she was violating HIPAA. Her phone was password protected, and she knew Nijjar's phone was password protected. She deleted the photo and the text from her phone as soon as she received the confirmation.

15

10.    <u>Dignity</u> <u>investigates</u> <u>and</u> <u>terminates</u> <u>plaintiff</u>

On April 13, 2015, plaintiff attended an investigatory meeting with Foreman and Anthony Robinson, the acting HR manager.  Foreman and Robinson asked plaintiff if she had shared her password with Winter.  They also informed her that sending the photo of the prescription to another pharmacist violated HIPAA.  Plaintiff explained the reasons for her actions, but Foreman and Robinson told her there was no need to explain and that she was under investigation.  Afterward, Robinson sent plaintiff an email summarizing their meeting and explaining this was an open investigation.  He would schedule a meeting with her to discuss the investigation's outcome.

Plaintiff responded.  She asked to know the policy for approving payroll when she is not in the office.  She also stated that Nijjar needed a written warning because she had had so many misfills.  Plaintiff asked for advice on how to approach her.  Nijjar had misfilled several prescriptions before the Ambien misfill, and plaintiff had given her verbal counseling.

Not receiving a response to her email, plaintiff wrote up Nijjar the next day, April 14.  She informed Robinson and Foreman of her action and gave them copies of her write-up.  Plaintiff had spoken with Foreman about Nijjar's mistakes in the past and had asked for counsel on how to address them.  She drafted a write-up in March 2015 and sent it to Foreman.  She received no response.  Plaintiff used that write-up form for the write-up she gave to Nijjar on April 14.

After receiving the write-up, Nijjar complained to Plummer about it.  Plummer brought Foreman to Nijjar so Nijjar could report the incident to her.

In the afternoon of April 14, Robinson sent an email to Patel and Foreman about a meeting they intended to have with plaintiff the next day, April 15.  Robinson stated that, after consulting with corporate HR personnel, they should have the meeting with plaintiff with the following options in mind:  (1) accept a resignation in lieu of termination; (2)

16

give plaintiff notice of termination effective April 17 and place her on unpaid administrative leave immediately; or (3) give plaintiff time to transition and accept her resignation effective May 1, 2015, placing her on paid administrative leave. Patel responded that if plaintiff did not resign in the meeting, "I would recommend we go with option 2. There is no reason to continue this relationship any longer than needed."

At the April 15 meeting, Robinson, with Patel and Foreman in attendance, informed plaintiff that her employment was terminated effective April 17. He did not offer plaintiff the option of resigning. He stated the two key issues behind the decision were sharing her password to a subordinate and texting protected health information, as well as her being a leader and being in her probation period. Foreman testified that plaintiff's write-up of Nijjar without going through chain of command was a contributing factor in the decision to discharge plaintiff. However, no one raised that issue at the meeting.

Plaintiff was very upset and stated she was being terminated because she complained to HR about Foreman. Robinson stopped the meeting and removed Foreman because in his opinion plaintiff had directed unprofessional behavior toward her in the meeting. Plaintiff asked Patel why this was happening and why he would not stop it. Patel responded, "I'm sorry, Mandy, this is not a decision I make." Patel testified it was not his decision. Foreman, however, testified it was Patel who decided to terminate plaintiff's employment.

Contrary to policy, Foreman did not report the prescription text incident to Dignity's HIPAA compliance department. The text messages had been deleted, and in her opinion that cured the possible violation. In the termination meeting, no one told plaintiff the incident had not been reported to compliance as a HIPAA violation.

Nearly a year later, on March 1, 2016, Dignity closed the outpatient pharmacy. Dignity elected not to renew the pharmacy's license.

17

### 11. This action

Plaintiff filed this action against Dignity on November 29, 2016. She prosecuted at trial causes of action for (1) national origin discrimination in violation of FEHA; (2) retaliation based on national origin discrimination in violation of FEHA; (3) retaliation in violation of Labor Code section 1102.5, subdivisions (b) and (c) for, respectively, plaintiff's disclosure of violations of law to Dignity and her refusal to participate in unlawful conduct (statutory section citations that follow are found in the Labor Code unless otherwise stated); and (4) wrongful discharge in violation of public policy.

The trial court bifurcated trial. In the first phase, the jury found Dignity liable for retaliation in violation of section 1102.5, subdivisions (b) and (c). It also found Dignity liable for wrongful discharge in violation of public policy. The jury found Dignity not liable for discrimination under FEHA. On that claim, the jury found that plaintiff's national origin was a substantial motivating reason for her termination, but Dignity would have terminated plaintiff had it not considered her national origin.

As mentioned, the jury awarded plaintiff a total of $1,032,511 in compensatory damages: $67,004 for past economic damages, $265,507 for future economic damages, $475,000 for past noneconomic damages, and $225,000 for future noneconomic damages. In the second phase, the jury awarded plaintiff $2,400,000 in punitive damages.

The trial court also awarded plaintiff attorney fees under FEHA. Although Dignity prevailed on the FEHA claims, the court concluded that plaintiff was the prevailing party from a practical standpoint because she established that her national origin was a substantially motivating factor in her termination and she met her litigation goals of obtaining damages.

18

Dignity moved for JNOV and a new trial.  The trial court granted the motions solely on the issue of punitive damages.  It concluded substantial evidence supported the jury's verdicts.  It reduced the punitive damages award to $1,032,004.

DISCUSSION

I

*Retaliation Under Section 1102.5, Subdivision (b)*

Dignity contends substantial evidence does not support the verdict on plaintiff's claim of retaliation based on a disclosure of a violation of law in violation of section 1102.5, subdivision (b) (section 1102.5(b)).  Dignity argues the evidence does not support the jury's findings that Dignity believed plaintiff made protected disclosures of any violations of law or that plaintiff's protected activities were a contributing factor in Dignity's decision to terminate plaintiff's employment.

Section 1102.5 is California's general whistleblower statute.  (*Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 933.)  It was enacted to encourage workplace whistleblowers to report unlawful acts without fearing retribution.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287.)  An employee injured by prohibited retaliation may file a private suit for damages.  (§ 1105.)

Section 1102.5(b) in general prohibits an employer from retaliating against an employee who discloses information with the belief the information discloses a violation of law by the employer.  The statute states that an employer "shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or

19

noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."  (§ 1102.5(b).)

To recover under section 1102.5, plaintiff must "establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. . . .  Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity."  (*Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718 (*Lawson*); § 1102.6.)

We note that *Lawson* overruled earlier authority, including authority from this court, which had applied the burden-shifting standard articulated in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 to whistleblower retaliation claims under section 1102.5.  (*Lawson, supra*, 12 Cal.5th at pp. 711, 718, fn. 2, overruling *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384.)  Because *Lawson* was published while this appeal was pending, we asked the parties to submit supplemental briefing on the effect the case may have on this matter.  We agree with Dignity that its substantial evidence arguments under section 1102.5—whether substantial evidence shows that plaintiff engaged in protected activities and whether those activities were a contributing factor in her termination—are directed to elements plaintiff had to prove by a preponderance of the evidence, and the trial court correctly instructed the jury concerning her burden on those elements consistent with *Lawson*.

An employee engages in activity protected by section 1102.5(b) "when the employee discloses ' "reasonably based suspicions" ' of illegal activity.  [Citation.]' (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 87.)  'To have a reasonably based suspicion of illegal activity, the employee must be able to point to some legal foundation for his suspicion—some statute, rule or regulation which may have been violated by the conduct he disclosed.  [Citation.]' (*Fitzgerald v. El Dorado County* (E.D.Cal. 2015)

20

94 F.Supp.3d 1155, 1172.)" (*Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 592.)

The trial court instructed the jury with three laws the jury could consider when deliberating whether plaintiff disclosed illegal activity: Section 1707.2 of title 16 of the California Code of Regulations regarding pharmacist consultations with patients (title 16, section 1707.2); section 1714 of title 16 of the California Code of Regulations obligating a pharmacist in charge to ensure the pharmacy's security (title 16, section 1714); and Business and Professions Code section 4081, subdivision (a), requiring a pharmacy to keep a current inventory of all its dangerous drugs. When the court ruled on Dignity's motion for JNOV, however, it did not address whether the evidence showed that plaintiff had disclosed violations of these three laws making her disclosures protected under section 1102.5(b).

Dignity argues substantial evidence does not support the jury's finding that Dignity believed plaintiff had disclosed, within the meaning of section 1102.5(b), a violation of any of the three laws provided by the court to the jury. Even if substantial evidence supports that finding, Dignity argues that substantial evidence does not support the jury's finding that plaintiff's disclosures were a contributing factor in her termination. We agree with Dignity that substantial evidence does not support a finding that plaintiff disclosed a violation of any of the three laws in a manner protected under section 1102.5(b).

A.      Title 16, section 1707.2 – pharmacist consultations

Title 16, section 1707.2 requires a pharmacist to "provide oral consultation" to the patient when "the prescription drug has not previously been dispensed to a patient" or has not been "dispensed to a patient in the same dosage form [or] strength . . . ." (Cal. Code Regs., tit. 16, § 1707.2, subd. (a)(3), (4).)

21

Dignity contends plaintiff's initial report to Foreman that consultations were not being done is not substantial evidence that plaintiff "disclosed" a violation of law, as that term is used in section 1102.5(b). It argues that plaintiff's report cannot qualify as a protected disclosure because Foremen already knew about the missed consultations. Dignity also argues that plaintiff's report of the investigator's findings of consultation screening at the audit and subsequent communications cannot qualify as protected disclosures because plaintiff was relaying information which a government agency had already discovered and disclosed.

We turn to plaintiff's initial report to Foreman. Plaintiff testified that in her first weeks of employment, she noticed that consultations "w[ere] not getting done." Technicians were not informing patients with new prescriptions that the pharmacist needed to talk with them. Pharmacists were reluctant to do consultations, and particularly Plummer and Winter were not doing them. Plaintiff reported her concerns about consultations to Foreman.

In other testimony, however, plaintiff stated that Dignity knew about the consultation problem before she reported it to Foreman. In her email to Patel after the Board of Pharmacy inspection and the citation for lack of consultations, plaintiff stated "this matter" concerned her most because "the prior managements" including Foreman, Plummer, and Winter knew about the lack of consultations and did nothing about them. Plaintiff also testified she wanted to write up Plummer for the consultation violation during the audit because she had mentioned the issue numerous times since she started employment, "so it wasn't something that no one was aware of it. They knew about it, and [Plummer] was a pharmacist-in-charge before that."

A split of authority exists among the districts of the Court of Appeal on whether section 1102.5(b) protects a disclosure of information already known by the employer or agency. The issue is presently before the California Supreme Court. (*People ex rel.*

*Garcia-Brower v. Kolla's Inc.*, 2021 Cal.App.Unpub. LEXIS 3044, (Cal. App. 4th Dist. May 10, 2021) (rev. granted Sept. 1, 2021, S269456).)

In *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832 (*Mize-Kurzman*), Division 2 of the First Appellate District concluded that a report of information that was already known does not constitute a protected disclosure. (*Id.* at p. 858.) The court based its ruling in part on federal authority interpreting the federal whistleblower protection act which had held that disclosures of publicly known information were not protected. (*Id*. at pp. 858-859; see *Huffman v. Office of Personnel Management* (Fed. Cir. 2001) 263 F.3d 1341, 1349-1350.) As the *Huffman* court had done, the court of appeal also interpreted the term "disclosure" in section 1102.5 based on its dictionary definition and ordinary sense of revealing something that was hidden or unknown. (*Mize-Kurzman*, at pp. 858-859.)

Division 3 of the Second District disagreed with *Mize-Kurzman* in *Hager v. County of Los Angeles* (2014) 228 Cal.App.4th 1538 (*Hager*), disapproved on another ground in *Lawson, supra*, 12 Cal.5th at p. 718, fn. 2. It concluded that, *given the provisions of former section 1102, subdivision (e)*, in the context of a disclosure by a *public employee*, the plain language of section 1102.5(b) did not limit whistleblower protection only to the employee who first disclosed conduct that had not been previously disclosed by another employee. (*Id*. at p. 1549.) The court also stated that *Mize-Kurzman's* reliance on just the dictionary definition of "disclosure" did not construe the statutory language in the context of the statute as a whole. (*Id*. at pp. 1549-1550.) In addition to protecting disclosures, section 1102.5 provides that "report[s]" by public employees to their employer constitute a protected disclosure under section 1102.5(b). (§ 1102.5, subd. (e).) The court reasoned, "A report does not necessarily reveal something hidden or unknown. To the extent *Mize-Kurzman* has highlighted an inconsistency in the statute, that is, a public employee must merely 'report' unlawful

23

conduct, and other employees must 'disclose,' unlawful conduct, it is up to the Legislature to resolve this issue, not this court." (*Hager,* at p. 1550.)

Plaintiff, of course, was not a public employee, so the provision in section 1102.5 enforced in *Hagar* that "reports" by public employees to their employers constitute a protected disclosure does not apply to her. But plaintiff relies on another provision from *Hagar* where the court rejected a defense argument that section 1102.5(b) protects only disclosures made by the first employee to disclose the information. *Hagar* stated such a rule "would defeat the legislative purpose of protecting workplace whistleblowers, as employees would not come forward to report unlawful conduct for fear that someone else already had done so." (*Hagar, supra*, 228 Cal.App.4th at p. 1550.)

We agree with *Hagar* that section 1102.5(b)'s protections are not limited just to the first employee to disclose. However, we also agree with *Mize-Kurzman* that a disclosure protected under section 1102.5(b) is a disclosure that reveals something which was not known. (*Mize-Kurzman, supra*, 202 Cal.App.4th at p. 858.) Even *Hagar* recognized a distinction between disclosures that consisted of "already known" information, which are not protected, from a rule protecting only the first employee to disclose, which is contrary to the intent of section 1102.5(b). (*Hagar, supra*, 228 Cal.App.4th at p. 1552.)

Here, there is no evidence in the record that plaintiff's disclosure that consultations were not happening was not already known by Dignity. Plaintiff testified that Dignity knew consultations were not happening before she told Foreman. According to plaintiff, Foreman, Plummer, and Winter knew before plaintiff started employment that consultations were not happening in the pharmacy, and they did nothing about it. Hence, plaintiff's reports of consultations not happening were not protected under section 1102.5(b).

In addition, plaintiff's summary of the pharmacy audit to Foreman and Patel does not qualify as a protected disclosure. In that instance, a government agency informed

*plaintiff* as Dignity's pharmacy manager that consultations were missed. A company representative's relaying what an investigative government agency informed the representative to other management personnel does not qualify as protected whistleblowing under section 1102.5(b). In that instance, it was the agency that effectively blew the whistle, not the employee.

B.  Title 16, section 1714 – pharmacy security

Another law the jury could consider when determining if plaintiff disclosed a violation of law to Dignity was title 16, section 1714. That regulation requires a pharmacist to "be responsible for the security of the prescription department, including provisions for effective control against theft or diversion of dangerous drugs . . . and records for such drugs . . . ." (Cal. Code Regs., tit. 16, § 1714, subd. (d).) "Possession of a key to the pharmacy where dangerous drugs and controlled substances are stored shall be restricted to a pharmacist." (§ 1714, subd. (d).) Substantial evidence does not support a finding that plaintiff disclosed a violation of this regulation under section 1102.5(b).

In her PIC assessment, plaintiff stated, despite later finding and reporting security problems with the pharmacy's security cameras, that the pharmacy was secure. Only a pharmacist had a key, and the pharmacy had provisions for effective control against theft of dangerous drugs and devices.

The evidence shows that Dignity was aware of security issues before plaintiff started her employment. Foreman testified on cross-examination that during its initial investigation of the pharmacy in early 2014, the Board of Pharmacy found problems with the pharmacy's security cameras. They were placed inadequately and not pointed at the right areas. They also fed directly into then pharmacist-in-charge Dallas's office instead of an on-site security monitoring system. Plaintiff does not contest this point in her brief. Her reports of security camera issues thus were not protected under section 1102.5(b).

25

C.     Business and Professions Code section 4081, subdivision (a) – inventory of dangerous drugs

A third law the jury was told it could consider when determining if plaintiff disclosed a violation of law was section 4081, subdivision (a) of the Business and Professions Code.  This statute requires a pharmacy to keep a current inventory of dangerous drugs and dangerous devices.  (Bus. & Prof. Code, § 4081, subd. (a).)  The pharmacist-in-charge and the pharmacy's owner or officer are jointly responsible for maintaining the inventory.  (Bus. & Prof. Code, § 4081, subd. (b).)  The current inventory must include "complete accountability" for all dangerous drugs handled by the pharmacy. (Cal. Code Regs., tit. 16, § 1718.)

No substantial evidence supports a finding that plaintiff's report of discrepancies between the computer inventory and actual inventories of controlled substances qualified as a disclosure under section 1102.5(b).  Dignity knew of the discrepancies before plaintiff began her employment.  Foreman was the Dignity employee who had reported the discrepancies to the Board of Pharmacy in early 2014.  When plaintiff informed Patel of the discrepancies, he already knew about them.  Pharmacy tech Ernie Santos testified that he and "everybody in the pharmacy" knew prior to plaintiff's employment of the discrepancy between the actual and recorded inventory of narcotics.

In her PIC assessment, plaintiff reported that the pharmacy maintained all drug and disposition records "(complete accountability)."  Moreover, plaintiff testified that she kept a separate paper inventory.  She stated, "[D]uring the whole time that I was there, everything was perfect.  There was absolutely no discrepancy whatsoever on the papers." In other words, there was nothing to report about narcotic inventory discrepancies either before or during plaintiff's employment which section 1102.5(b) would protect.

In her opposition, plaintiff does not contend otherwise.  She instead argues that there continued to be new issues with missing narcotics and misreporting of missing

26

medication.  But those issues were the same issues the Board of Pharmacy had already reported to Dignity and that Dignity already knew before plaintiff began her employment. They were not new issues.

Plaintiff contends that assuming the preexisting pharmacy issues were well known, Dignity should still be liable under section 1102.5(b) because she made "multiple reports of new illegal acts" to Foreman and Patel which occurred after she began her employment.  None of the alleged new acts, however, were presented to the jury as grounds for liability under section 1102.5(b).  The court instructed the jury only on the three statutes discussed above.  Indeed, plaintiff chose the underlying laws that were the subject of her section 1102.5(b) claim.  She cannot now seek to litigate new claims which were not presented to the jury.  "We, of course, cannot look to legal theories not before the jury in seeking to reconcile a jury verdict with the substantial evidence rule."  (*People v. Kunkin* (1973) 9 Cal.3d 245, 251.)

Substantial evidence does not support the jury's verdict of retaliation under section 1102.5(b).  We will order judgment on this cause of action be entered in favor of Dignity.

II

*Retaliation Under Section 1102.5, Subdivision (c)*

Dignity contends substantial evidence does not support the jury's verdict that Dignity retaliated against plaintiff in violation of section 1102.5, subdivision (c) (section 1102.5(c)) for her refusal to engage in unlawful activities.  Dignity argues the evidence does not support the jury's finding that plaintiff refused to participate in illegal activity or that her refusal to participate was a contributing factor in Dignity's termination decision.

An employer may not retaliate against an employee who refuses to participate in an activity that would result in a violation "of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."  (§ 1102.5(c).)  To recover under this statute, the employee must show that the activity in question "*actually*

*would* result in a violation or noncompliance with a statute, rule, or regulation." (*Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 719.) The employee must identify the specific activity she refused to participate in "and what specific statute, rule, or regulation would be violated by that activity." (*Ibid.*) Dignity contends that substantial evidence does not support the jury's finding that plaintiff refused to participate in an unlawful activity.

In her opposition brief, plaintiff contends Foreman wanted her to commit fraud by covering up the missing narcotics. Foreman asked her "to alter logs," but she refused. Foreman ordered her not to create a perpetual or paper inventory, but she refused. Plaintiff believed that complying with Foreman's requests would violate state regulations and would constitute fraud.

The trial court instructed the jury on the same three statutes it instructed on plaintiff's section 1102.5(b) claim for plaintiff's section 1102.5(c) claim. Of the three statues, only Business and Professions Code section 4081 could apply to plaintiff's section 1102.5(c) claim. That statute required plaintiff to keep a current inventory of dangerous drugs that included complete accountability. (Bus. & Prof. Code, § 4081, subd. (a); Cal. Code Regs., tit. 16, § 1718.)

No substantial evidence in the record supports a finding that Foreman ordered, or plaintiff refused to participate in, an activity that would violate Business and Professions Code section 4081. Although counsel on direct examination asked plaintiff if Foreman asked her to change her paper inventory to match the incorrect computer inventory, plaintiff clarified that it was the opposite. Foreman asked her to change the computer inventory so that it matched plaintiff's paper inventory, which was correct. Plaintiff believed it was illegal to change the computer numbers to match her paper inventory because "they," presumably the Board of Pharmacy, would want to know where the discrepancy went. A discrepancy would still exist if she did not change the computer numbers, but she stated that discrepancy would not go under her license because she was

28

not changing anything and was relying on the paper inventory. Plaintiff told Foreman "multiple times" why it was important to use just the paper inventory instead of changing the computer inventory. Every month, when she inventoried narcotics, she had the "rough conversation" with Foreman that she was not going to change the numbers in the computer.

Whether the requested activity constitutes a violation of law is a question of law for the trial court to decide. (*Nejadian v. County of Los Angeles, supra*, 40 Cal.App.5th at p. 719.) There is no indication in the record that the trial court made that determination, and nothing on the face of Business and Professions Code section 4081 would have prohibited plaintiff from making the changes in the computer inventory to match her paper log to have a "current inventory" and "complete accountability" of the narcotics on hand. (Bus. & Prof. Code, § 4081, subds. (a), (b); Cal. Code Regs., tit. 16, § 1718.) The statute did not specify that the log be kept in a computer, only that it be current and complete. Plaintiff does not explain in her brief how making the computer inventory current would violate the statute.

Plaintiff later testified that Foreman, responding to plaintiff's request to report the discrepancy to the DEA, told plaintiff it was not plaintiff's responsibility to tell her what to do; plaintiff needed to do what Foreman asked her to do and not create a perpetual log and "go with the computer system." It is unclear in this context and in light of plaintiff's other testimony whether plaintiff was saying that Foreman told her in this remark not to change the computer system and go with it. Foreman did not use those words. Even if plaintiff's statement can be so interpreted, there is no evidence Foreman told plaintiff to keep an inaccurate or non-current inventory in violation of the statute. There is no evidence Foreman asked plaintiff to violate Business and Professions Code section 4081. As a result, we will order judgment on this cause of action be entered in favor of Dignity.

29

## III

### *Wrongful Discharge in Violation of Public Policy*

An employee may bring an action in tort when her discharge from employment "contravenes the dictates of public policy." (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 177.) A statutory declaration of public policy adopted by the Legislature is an appropriate source for determining whether a discharge violates the state's public policy. (*Shaw v. Superior Court* (2017) 2 Cal.5th 983, 1004.) The employee must establish that her discharge was substantially motivated by a violation of public policy. (*Yau v. Allen* (2014) 229 Cal.App.4th 144, 154.)

Plaintiff alleged in her complaint that her termination violated public policy, and in particular, those policies codified at Health and Safety Code section 1278.5 (section 1278.5), subdivision (b); Government Code section 12940, subdivisions (a) and (h); and section 1102.5, subdivisions (b) and (c). The trial court, however, instructed the jury only on section 1278.5 for this cause of action.

Section 1278.5 provides whistleblower protection to health care workers who report concerns about the quality of patient care. (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 667, fn. 6.) The statute prohibits a health facility from discriminating or retaliating in any manner against an employee because that person "[p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity." (§ 1278.5, subd. (b)(1)(A).) The whistleblower protections apply "primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations." (§ 1278.5, subd. (a).)

In finding Dignity liable for unlawful termination in violation of a public policy, the jury found that plaintiff's "report of unsafe patient care and conditions" was "a substantial motivating reason" for Dignity's decision to discharge plaintiff.

Dignity contends that no substantial evidence shows plaintiff reported unsafe patient care or conditions. Although plaintiff testified that "all" the issues she reported to Foreman "related to patient safety," Dignity argues the reported issues related to employee and employer relations, not unsafe patient care. Dignity further contends that even if plaintiff reported unsafe patient care to Foreman, there is no substantial evidence that plaintiff's reports were a substantial motivating reason for her termination.

Dignity also claims that plaintiff's email to Foreman and Patel reporting the Board of Pharmacy auditor's findings cannot constitute a complaint under section 1278.5 for the same reasons it did not constitute a protected disclosure under section 1102.5(b). Holding that merely transferring results from an openly conducted government audit is a protected report under section 1278.5 "would ' "create a legion of underserving protected 'whistleblowers' arising from the routine workings and communications of the job site." ' " (Quoting *Conn v. Western Placer Unified School Dist.* (2010) 186 Cal.App.4th 1163, 1182.)

A.    Reports of unsafe patient care

Substantial evidence in the record supports the jury's finding that plaintiff reported incidents of unsafe patient care to Foreman outside of her report on the audit. Plaintiff complained to Foreman that misfills were occurring, meaning the pharmacy was dispensing the wrong medication to the patient. They were happening weekly. Plaintiff stated misfills occurred because workflow was not functioning properly and pharmacy staff were not focused on their jobs. Plaintiff informed her staff that "filling the wrong prescription is playing with patients' lives." Further misfills would result in progressive discipline.

31

Plaintiff reported that prescriptions were missing. About four times a week, patients and doctors were asking for a copy of their prescriptions, and the pharmacy had no record of them. Without a record, if a patient complained that she did not get the correct prescription, the pharmacy would not know what to dispense. This occurred in part because the pharmacy had no filing system. It was difficult to find anything. In addition, employees were using drawers in the workspace to store food and personal items. Food "was everywhere," presenting a risk of contamination. Plaintiff emptied the drawers and used them for a filing system. Plummer, and to some extent Winter, pushed back against plaintiff's actions.

Plaintiff reported that expired medications were on the shelves. Expired medications related to patient care because if given to a patient, they could have no effect or an adverse effect on the patient. They were "all over the place," some dating back to 2010.

Plaintiff complained that prior authorizations were not being done. These were to occur when an insurance company denied coverage for a particular prescription. If there was not a substitute or replacement drug that insurance would cover, a technician was supposed to ask the prescribing doctor to explain the need for the medication to the insurance company and get its approval. Instead, technicians, for example, were telling cancer patients who needed the prescribed medication that the prescription was not approved instead of contacting the doctor to obtain authorization.

Patients were waiting too long for prescriptions. This was due in part to the lack of a structured workflow and assigned responsibilities. Patients in critical condition were not prioritized. Plummer would put the prescriptions in one pile, and the other employees did not know which ones were urgent. This created chaos in the pharmacy.

To bring order and end long lines, plaintiff established a workflow process that assigned responsibilities to stations for such things as urgent medications, obtaining the prescription, and typing the prescription, and she required the pharmacists to rotate

through each station to learn the responsibilities. She emphasized timely performance to avoid overtime. Plummer and Winter pushed back and were reluctant to make these changes. They obstructed the workflow, which caused overtime.

Plaintiff counseled Plummer about doing nonwork-related tasks during work hours, and she reported that to Foreman. Plaintiff created a log for employees to sign in and sign out when they took breaks. Plummer pushed back against that effort, as did Winter to some extent.

As mentioned, plaintiff reported before the Board of Pharmacy audit occurred that consultations were not being done. Consultations related to patient health care because they were to ensure that a patient knew how to take the medication and that it was the correct medication based on the patient's understanding from the physician.

Plaintiff reported all these issues to Foreman. Substantial evidence supports the jury's finding that plaintiff reported incidents of unsafe patient care to Foreman.

B.    Unsafe conditions as reason for termination

Dignity contends there is no substantial evidence that plaintiff's reports of unsafe patient care were a substantial motivating reason for her termination. A substantial motivating reason is one that contributed to plaintiff's discharge. It must be more than a remote or trivial reason, but it does not have to be the only reason which motivated the termination. (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 705 (*King*); see *Davis v. Farmers Ins. Exchange* (2016) 245 Cal.App.4th 1302, 1321-1323) [FEHA's substantial motivating factor standard of causation applies to claims for wrongful discharge in violation of public policy].)

Dignity, however, provides no argument on this issue. " 'It is the duty of appellant to show in [its] brief wherein the evidence does not support the findings.' " (*Wallace v. Thompson* (1954) 129 Cal.App.2d 21, 22, quoting *Trancoso v Trancoso* (1950) 96 Cal.App.2d 797, 798.) The appellant's brief must "[s]tate each point under a separate

heading or subheading summarizing the point, and *support each point by argument* and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B), italics added.) When the appellant's brief does not satisfy this rule, the appellant forfeits the argument, and we presume substantial evidence supports the challenged finding. (See *Cox v. Bonni* (2018) 30 Cal.App.5th 287, 311; *Wallace*, at p. 22.)

Dignity's brief contains an appropriate heading, but the point is not supported by any argument. If Dignity wanted to challenge the sufficiency of the evidence to support the jury's finding that plaintiff's reports of unsafe patient care were a substantial motivating reason for her termination, "it had to cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law." (*King, supra*, 53 Cal.App.5th at p. 710.) Its omission of argument forfeits the issue.

In any event, substantial evidence supports the jury's determination that plaintiff's reports of unsafe patient care were a substantial motivating reason for her termination. The jury could conclude the reports were a substantial reason because when plaintiff reported these matters to Foreman, which she did often, the matters regularly concerned Plummer and Winter, the employees Foreman sought to protect. Foreman routinely refused to allow plaintiff to discipline the two employees beyond an oral counseling for their violations of policy and obstructive behavior, even though they had been previously warned and their actions threatened patient safety. The jury could find plaintiff's ongoing reports against Plummer and Winter were a substantial reason Foreman sought plaintiff's termination.

Foreman's responses to plaintiff's reports further support this conclusion. When plaintiff reported the misfills to Foreman, Foreman ignored her. She told plaintiff it was not her responsibility to do this and to do just what Foreman told her to do. She instructed plaintiff not to bring up issues that arise in the pharmacy. She would tell plaintiff what needed to be done in the pharmacy. When plaintiff raised the issue of lost

prescriptions, Foreman ignored her or indicated it was not important. Foreman's responses were no different for the other issues plaintiff reported to her. Foreman never asked plaintiff to document the issues for proof of what was happening.

The trial court reached the same conclusion on Dignity's motion for JNOV. It ruled there was sufficient evidence for the jury to find that Dignity's reasons for terminating plaintiff were pretextual. Part of that evidence was Foreman's protection of Plummer and Winter. Addressing Dignity's arguments of insufficient evidence, the court stated: "The resistance that [plaintiff] encountered was due to the fact that the tenured staff in the pharmacy, the old guard if you will, refused to change their longstanding practices. And Foreman who had worked in the pharmacy, worked with this staff for years, sided with her friends when they objected to the changes that [plaintiff] was trying to make in the operation. So Ms. Foreman ended up undermining [plaintiff's] attempts to change the culture at the pharmacy. [¶] From my perspective the jury no doubt concluded that when Foreman realized that [plaintiff] wasn't going to modify her plan, that the only other choice that Ms. Forman could see is to have [plaintiff] sacked."

Substantial evidence shows that plaintiff reported unsafe patient care and conditions to Foreman, and that her reports were a substantial motivating reason for her termination. Dignity has forfeited the issue. We will affirm the judgment in favor of plaintiff on the cause of action for wrongful termination in violation of public policy.

IV

*Punitive Damages*

Plaintiff may recover punitive damages if she proved at trial by clear and convincing evidence that Dignity was guilty of oppression, fraud, or malice. (Civ. Code, § 3294, subd. (a).) For Dignity to be liable for punitive damages based upon the acts of its employees, plaintiff had to show that Dignity "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression,

35

fraud, or malice. With respect to a corporate employer, the . . . authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

Dignity contends clear and convincing evidence does not establish that Foreman and Patel were managing agents or that either acted with malice.

In her cross-appeal, plaintiff raises three challenges to the trial court's award: (1) the trial court erred by reducing the jury's original award of punitive damages on JNOV and not by remittitur under Code of Civil Procedure section 662.5; (2) the trial court erred in granting a new trial on the basis of excessive damages by not specifying in writing its reasons for granting the motion as required by Code of Civil Procedure section 657; and (3) both Foreman and Patel were managing agents who acted with malice, and the jury's award was not excessive and was constitutional.

A.      Managing agent

A managing agent is someone who "exercise[s] substantial discretionary authority over decisions that ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 577.) Liability does "not depend on employees' managerial level . . . . Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees." (*Id.* at pp. 576-577.) A plaintiff must show the employee exercised substantial discretionary authority over significant aspects of a corporation's business. (*King, supra,* 53 Cal.App.5th at p. 713.)

On Dignity's motion for JNOV, the trial court determined that Foreman was not a managing agent, but it affirmed the jury's finding that Patel was a managing agent and that he acted with malice. Foreman had no authority to determine or change corporate

36

policy. The jury, however, could conclude Patel was a managing agent because he, being responsible for the hospital's operation, had authority over the hundreds of employees who worked there, could make policy that affected the hospital, and could influence how corporate policies were applied at the hospital. He exercised substantial discretionary authority at the hospital on behalf of Dignity.

We agree with Dignity and the trial court that the jury could not have found that Foreman was a managing agent. Plaintiff contends the evidence shows Foreman was a hospital administrator as the director of pharmacy, and her investigation formed the basis for taking adverse action against plaintiff. The trial court stated that although Patel made the decision to terminate plaintiff, he did so at Foreman's behest. But the trial court also found that unlike Patel, Foreman did not have the authority to determine or change corporate policy. At most, she could develop policy and submit it to Patel for implementation. Plaintiff directs us to no evidence that contradicts the trial court's finding.

For purposes of argument only, we assume Patel was a managing agent, and we turn our attention to the issue of malice.

B.     Malice

To recover punitive damages, plaintiff had to establish that Patel's act of wrongfully terminating her employment based on her reporting unsafe patient care and conditions was an act of oppression, fraud, or malice. (Civ. Code, § 3294, subds. (a), (b).)

On the motion for JNOV, the trial court found the jury could conclude by clear and convincing evidence that Patel acted with malice because he allowed his decision to be driven by Foreman's animus against plaintiff. Foreman's determination to have plaintiff terminated was driven by malice. She displayed bias against Iranians, and she did not like plaintiff's repeated reprimands against Plummer and Winter, Foreman's

37

friends.  Under his management style, Patel did not allow himself to become personally embroiled in the details of personnel decisions.  He relied on his subordinates to make suggestions and propose policies regarding personnel.  The court found that Patel made the decision to terminate plaintiff, but he relied on Foreman.  She was the one who brought the issue to Patel's attention and moved the hearing toward termination rather than some lesser sanction.  Foreman's animus toward plaintiff "pushed Patel to adopt the recommendation to terminate the Plaintiff."  The trial court stated the evidence showed that Patel acted with malice because he allowed this to happen.

Dignity claims the evidence does not establish malice.  At closing argument in trial, plaintiff argued that the strongest evidence of malice was Patel's decision to forego progressive discipline and terminate plaintiff when the pharmacy needed someone like her to operate it in compliance with law.  Dignity contends that wrongful termination, without more, does not establish malice.  Moreover, the act of malice must be on the part of Patel.  Foreman's malice cannot be imputed to Patel on a theory of respondeat superior liability or where the evidence shows only negligent supervision.  Dignity argues there is no evidence that Patel even knew that Foreman sought to retaliate against plaintiff or discriminated against her based on her nationality.  We agree with Dignity.

For purposes of awarding punitive damages, "malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (Civ. Code, § 3294, subd. (c)(1).)  Something more than the mere commission of a tort is required to establish malice.  (*Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 716.)

The Legislature's goals in enacting Civil Code section 3294, subdivision (b) limiting punitive damages against corporate defendants "were to avoid imposing punitive damages on employers who were merely negligent or reckless and to distinguish ordinary respondeat superior liability from corporate liability for punitive damages."  (*White v.*

38

*Ultramar, Inc., supra*, 21 Cal.4th at p. 572.) "[W]rongful termination, without more, will not sustain a finding of malice or oppression." (*Scott v. Phoenix Schools, Inc., supra*, 175 Cal.App.4th at p. 717.)

Where, as here, there is no evidence that Patel intended to harm plaintiff, plaintiff had to establish by clear and convincing evidence that Patel's conduct in terminating her was despicable and was carried on with a willful and conscious disregard of plaintiff's rights. (Civ. Code, § 3294, subd. (c)(1).) "Despicable conduct" is conduct that is " ' "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." ' (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 330-331.) Such conduct has been described as having the character of outrage frequently associated with crime. (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287.)" (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1159.)

Clear and convincing evidence does not establish that Patel's conduct in wrongfully terminating plaintiff was despicable for purposes of awarding punitive damages. Patel believed, based on Foreman's reports, that plaintiff's relationship with Foreman had deteriorated beyond repair and to the hospital's detriment. The evidence shows Patel may have been negligent in his supervision of Foreman and her relationship with plaintiff, but relying on Foreman's recommendation, even if she made it out of animus, was not despicable where there is no evidence Patel was aware of and ratified her pretextual or even racist reasons for seeking termination. There is no indication Patel knew of or shared Foreman's bias against Iranian women or sought to protect Foreman's friends in the pharmacy. And although reasonable minds may disagree over the propriety of terminating plaintiff for sharing her password and texting a prescription under the circumstances here, there is no dispute, and plaintiff admitted, that her actions violated company policy. There is insufficient evidence to find that Patel's actions were

loathsome and had the character of outrage associated with crime when he sought to enforce company policy, even in these circumstances.

Plaintiff does not persuade us otherwise. Except to repeat the trial court's reasons, she argues the award was proper due to other acts taken by Foreman and Patel—not informing plaintiff of the pharmacy's condition when she began her employment and attempting to induce plaintiff to commit fraud by changing the computer's narcotics inventory. Neither of these reasons indicate Patel's decision to terminate plaintiff was malicious.

Because we find the trial court erred in awarding punitive damages, our decision moots plaintiff's cross-appeal.

V

*Instructional and Evidentiary Error*

Since we will not direct judgment for it on all grounds, Dignity contends we should order a new trial based on instructional error and evidentiary error. It claims the trial court erred by not instructing the jury consistent with *Mize-Kurzman, supra*, 202 Cal.App.4th 832, and by admitting expert testimony from a lay witness.

A.    Instructional error

We need not address the claim of instructional error. Dignity contends the trial court erred by not instructing the jury, consistent with *Mize-Kurzman*, that plaintiff could not recover under section 1102.5(b) for reporting information which was publicly known or known by Dignity. As explained above, we will reverse the judgment against Dignity under section 1102.5(b) because no evidence indicated plaintiff had disclosed violations of law which were not known, as required under *Mize-Kurzman.*

40

B.        Admission of expert testimony by lay witness

Dignity contends the trial court committed prejudicial error when it admitted testimony from plaintiff's treating psychologist, testifying as a lay witness, that (1) plaintiff suffered from "Persistent Depressive Disorder," she suffered emotional distress because she is "Persian," and her distress was "exacerbated by Persian culture"; and (2) plaintiff's termination caused her emotional distress.  Dignity asserts the error prejudicially affected the award of noneconomic damages, and it asks us to remit the damages or order a new trial on the issue.

1.        Background

Dr. Bahar Safaei-Far, a licensed clinical psychologist, began treating plaintiff in December 2017, about one year and three months before trial and approximately two years and eight months after plaintiff was terminated.  Plaintiff did not designate Safaei-Far as an expert.  Prior to trial, Dignity moved in an in limine motion to exclude Safaei-Far's testimony because she was an undisclosed expert, and any lay opinions she might offer were hearsay, irrelevant, and improper.  The trial court denied the motion.

Safaei-Far diagnosed plaintiff as having Persistent Depressive Disorder, commonly known as chronic depression.  Over Dignity's objection, Safaei-Far testified that plaintiff's depression disorder was related to her employment at Dignity.  Plaintiff had many issues surface during counseling because of her termination.

Safaei-Far's treatment of plaintiff started as couple's counseling and included plaintiff's boyfriend, not as treatment due to plaintiff's termination.  It began because of the boyfriend's infidelity.  After learning of plaintiff's former employment, Safaei-Far began asking plaintiff for information about it.  Asked how plaintiff discussed the harm caused her by the termination, Safaei-Far stated plaintiff said she lost her self-confidence, was experiencing anxiety, and was having difficulty in relationships.  Safaei-Far believed that plaintiff's depression disorder originated at the time of her termination.

41

Like plaintiff, Safaei-Far is Persian. She testified she understood the familial and social context for Persians as well as the dynamics in plaintiff's family. When counsel asked her to describe how an employment termination could impact the social identity of someone of "Persian nationality origin" like plaintiff, Dignity objected on causation and expert opinion. The trial court overruled the objection. Safaei-Far stated plaintiff came from a very educated family, and the termination of "someone at her level" caused extreme embarrassment and shame on the person and the family. Over Dignity's objection, Safaei-Far stated that Persian culture exacerbated that kind of harm. In Persian culture, education and status are held in high regard. The termination caused embarrassment and shame within plaintiff's family when they had to describe what happened to her.

Safaei-Far stated that plaintiff already considered herself the lesser educated of her siblings, and the termination further injured her self-identity. She felt extreme shame and worthlessness, and that her family was looking down on her because of the termination. Safaei-Far explained that shame exacerbates depression.

Safaei-Far stated that on March 11, 2018, plaintiff related experiencing a panic attack after an incident occurred at her new job. Plaintiff had panic attacks intermittently and typically when she felt she was being reprimanded or felt anxiety. Counsel asked whether Safaei-Far related plaintiff's susceptibility to panic attacks to her termination from Dignity. Dignity objected as to causation and expert opinion. The court sustained the objection. Counsel next asked Safaei-Far to describe the harm to plaintiff which the termination from Dignity caused. The court sustained an objection on the same grounds. Counsel then asked twice if Safaei-Far had assessed how much harm the termination caused plaintiff. The court sustained the same objection.

Safaei-Far stated that sometime after the termination, plaintiff's house was burgled and her relationship with her boyfriend ended. Counsel asked whether those incidents

became the new cause of plaintiff's depression disorder. Over Dignity's objection on expert witness grounds, Safaei-Far said the incidents just added more to the disorder.

At closing argument, plaintiff's counsel relied upon Safaei-Far's causation testimony while discussing plaintiff's noneconomic damages. Counsel stated, "From [plaintiff's] doctor's notes, which are all in evidence, she's not been the same since. And the doctor clearly put it back to her termination from Dignity Health. It caused these problems. This is just according to the, you know, psychologist in her words."

Dignity moved for a new trial on noneconomic damages, and the trial court denied the motion. It found that Safaei-Far's testimony that plaintiff's termination was a cause of her anxiety was inadmissible. However, the court ruled the error was harmless because Safaei-Far had earlier testified without objection that plaintiff's chronic depression was related to her termination, and her depression and anxiety began when she was terminated. The court further ruled that Safaei-Far's comments about how Iranians view professional success and humiliation if terminated were admissible lay opinions because the comments were based on Safaei-Far's personal experience alone.

The trial court also determined the awards for noneconomic damages were not excessive. Plaintiff was still suffering from Persistent Depressive Disorder at the time of trial, had struggled with suicidal idealization after the termination, felt extreme shame and lack of worth, and was suffering panic attacks, including one during trial.

2.      Analysis

Dignity argues (a) Safaei-Far's evidence of cultural stereotypes is inadmissible; (b) Safaei-Far was not competent as a lay witness to testify of Persian culture; (c) she had no personal knowledge to testify on the cause of plaintiff's emotional distress, which was an ultimate question of fact for the jury; and (d) even if she had qualified as an expert witness, it would have been improper to allow her to testify on the ultimate factual issue of causation of plaintiff's distress. Dignity contends the errors were prejudicial because

if the trial court had not admitted the evidence, it is reasonably probable the jury's verdict would have been more favorable to Dignity. We agree with Dignity that the error was prejudicial.

A lay witness may offer opinion testimony " 'if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony.' (*People v. Leon* (2015) 61 Cal.4th 569, 601; see Evid. Code, § 800.)" (*People v. Jones* (2017) 3 Cal.5th 583, 602.) A lay witness may also offer opinion testimony if that opinion testimony has been held admissible by case law or statute. (Evid. Code, § 800.) Lay opinion that goes beyond the facts the witness personally observed is inadmissible. (*Jones*, at p. 602.)

Lay opinion testimony is admissible only "where the concrete observations on which the opinion is based cannot otherwise be conveyed." (*People v. Melton* (1988) 44 Cal.3d 713, 744.) "If the facts cannot be accurately or adequately stated, and what the witness knows can be testified to only in the form of an opinion, testimony in that form may be admitted." (1 Witkin, Cal. Evid. (5th ed. 2022) Opinion Evidence, § 3.) "Opinion testimony of a lay witness may be particularly helpful when the matters observed by the witness may be too complex or subtle to enable the witness accurately to convey them without resorting to the use of conclusory descriptions." (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112.)

Nonetheless, a lay witness may not offer an opinion on matters only within the knowledge of experts. "If the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case." (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 702 [standard of care in constructing home was not proper subject of lay opinion].)

We review the trial court's admission of lay opinion testimony for abuse of discretion. (*Osborn v. Mission Ready Mix, supra*, 224 Cal.App.3d at p. 112.)

Although she testified as a lay witness, Safaei-Far offered opinion that was beyond the common understanding of laymen and was based on her expertise as a psychologist. Her improper expert opinions, admitted over objection, included her diagnosis that plaintiff suffered from Persistent Depressive Disorder and the depression disorder was related to and originated at plaintiff's termination, and that Persian culture exacerbated her condition. There is no evidence in the record from which a court could find that these opinions were within laymen's common understanding.

Plaintiff argues that Safaei-Far's opinions about plaintiff's emotional state were admissible because Safaei-Far was plaintiff's treating physician. It is true that a treating physician "may testify as to any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience. This may well include opinions regarding causation and standard of care because such issues are inherent in a physician's work." (*Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 39.) However, Code of Civil Procedure section 2034.210 requires a party intending to elicit expert opinion from a treating physician to designate the physician as an expert. "[T]he transformation from treating physician to expert does not occur unless the treating physician is identified by name and address in the proponent's designation[.]" (*Kalaba v. Gray* (2002) 95 Cal.App.4th 1416, 1418, 1422-1423 [nonsuit upheld where trial court correctly rejected standard of care testimony from plaintiff's treating physicians who were not designated as experts]; see *Gotschall v. Daley* (2002) 96 Cal.App.4th 479, 484, fn. 3 [dismissal could not be vacated under Code of Civil Procedure section 473, subdivision (b) where party failed to designate treating physician as expert resulting in dismissal for lack of evidence on causation].) Because plaintiff did not designate Safaei-Far as an expert, Safaei-Far's expert opinions regarding plaintiff's condition and its causes were not admissible.

Safaei-Far's testimony of Persian culture's attitudes toward education and employment and how those attitudes impacted someone like plaintiff or plaintiff herself

45

were not inadmissible opinion because they were based on Safaei-Far's personal and independent experiences. However, when Safaei-Far testified that the shame plaintiff experienced from cultural attitudes exacerbated plaintiff's depression, she rendered expert opinion without having been designated as an expert.

The trial court ruled that Dignity did not object to much of Safaei-Far's inadmissible testimony. We disagree. Dignity filed an in-limine motion to exclude Safaei-Far's expert testimony for not being named as an expert, and it objected to the line of questioning several times. The trial court denied the motion and overruled the objections. "It has long been the rule that '[where] a party has once formally taken exception to a certain line or character of evidence, he is not required to renew the objection at each recurrence thereafter of the objectionable matter arising at each examination of other witnesses; and his silence will not debar him from having the exception reviewed.' [Citation.]" (*People v. Antick* (1975) 15 Cal.3d 79, 95, disapproved on another ground in *People v. McCoy* (2001) 25 Cal.4th 1111, 1123.)

Having concluded there was evidentiary error made over Dignity's objections, we must determine if the error was prejudicial. For that, we apply the *Watson* standard of review. We affirm the judgment unless, after examining the record, we conclude it is reasonably probable the jury would have reached a result more favorable to Dignity had the errors not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 258.)

Dignity contends the errors were prejudicial because evidence of cultural stereotypes to inflate a damages claim is inherently prejudicial and admitting Safaei-Far's testimony of causation allowed Safaei-Far to vouch for plaintiff's testimony even though she had no personal or expert knowledge of whether plaintiff's version of the disputed events was accurate. Dignity also argues that Safaei-Far's testimony skewed the issue of whether her termination or her boyfriend's infidelity caused plaintiff's distress, and it urged the jury to inflate the damages amount based on cultural stereotypes. Moreover,

46

plaintiff's counsel relied upon Safaei-Far's testimony of causation in his closing argument. Dignity argues that without this testimony, the jury would have reasonably concluded plaintiff's emotional distress stemmed from her relationship with her boyfriend. At a minimum, the jury would have awarded less than the $700,000 it awarded.

We do not believe it is reasonably probable the jury would have concluded plaintiff's emotional distress stemmed from the relationship with her boyfriend had Safaei-Far's testimony of causation not been admitted. Plaintiff testified of her emotional distress. She stated that after being terminated, she felt worthless and that she did not deserve to live. She thought about killing herself multiple times because she believed the termination was unfair and life did not mean anything. She had never felt those feelings before. She lost self-confidence, and in relationships with people close to her she felt she deserved to be abused and mistreated.

Plaintiff told Safaei-Far the termination took a significant toll on her life and she had not been the same since. She lost self-confidence, experienced intense anxiety, and doubted herself. After the termination, each time she applied for a job, if the employer asked, she had to explain the termination and tell them she thought the termination was wrong. Plaintiff told Safaei-Far that had she learned of her boyfriend's infidelity before the termination, she would have ended the relationship. But after the termination, she felt she had lost everything, and the relationship was the last thing she had to hold on to.

Moradi, plaintiff's coworker, testified plaintiff came to her office on the day of her termination. She was crying and hysterical. Santos, another coworker, walked into Moradi's office while plaintiff was there. Plaintiff was crying and too upset to talk.

However, despite this evidence, we think it is reasonably likely the jury would have rendered a more favorable verdict to Dignity had it not heard inadmissible expert testimony that the termination caused plaintiff a mental health illness known as Persistent Depressive Disorder, for which she was still being treated at the time of trial, and that the

47

disorder was exacerbated by elements of Persian culture. No one doubts that wrongful termination can be severely emotionally distressing. But it is another thing to hear from a lay witness that the termination caused a mental illness for which plaintiff is still being treated approximately five years later and which was exacerbated by her Persian culture. It is reasonably likely the jurors relied upon the inadmissible testimony to award a greater amount in noneconomic damages than they would have, had they not heard plaintiff was still suffering from a mental disorder caused by the termination.

We will thus reverse the award of noneconomic damages and remand the matter for retrial on this issue.

VI

*Economic Damages*

Dignity contends we should order a new trial on the issue of economic damages because the award is not supported by the evidence. The award was based on expert testimony which assumed the outpatient pharmacy would have remained open and plaintiff would have retained her position there or at another Dignity pharmacy until retirement if she had not been terminated. Dignity claims the award is excessive because the outpatient pharmacy closed in 2016 and there was no other position for plaintiff within Dignity at that time. Thus, no evidence supports the award based on plaintiff's continued employment with Dignity.

A.     Background

Dr. Charles Robert Mahla, an economist, testified for plaintiff as an expert witness on the issue of economic damages. He concluded that plaintiff's economic damages totaled $332,512: $67,004 for past economic damages and $265,507 for future economic damages. His calculations assumed plaintiff worked for Dignity until the end of her expected work life and the outpatient pharmacy was never closed.

48

Under cross-examination, Mahla testified that if plaintiff's earnings from Dignity had ended in March 2016 for any reason, including if the pharmacy had closed and she was not moved to another Dignity location, her lost earnings would have ended on the date the pharmacy closed.

The outpatient pharmacy closed on March 1, 2016. Winter, the employee who had replaced plaintiff, lost her job. At that time, Dignity operated three other outpatient pharmacies in Northern California: one in the Sacramento area, one in Stockton, and one in Santa Cruz. When the Woodland pharmacy closed, there were no positions for an outpatient pharmacy pharmacist manager at the Stockton and Santa Cruz locations. The Sacramento and Stockton pharmacies closed. When the Woodland pharmacy closed, all its physical prescriptions were sent to Walgreen's. Plaintiff's employment would have been terminated when the pharmacy closed had she still been an employee at that time.

The jury awarded plaintiff $67,007 in past economic damages and $265,507 in future economic damages, the amounts calculated by Mahla. Denying Dignity's motion for new trial on economic damages, the trial court concluded the award was supported by sufficient evidence. It reasoned it was logical to conclude the pharmacy had been profitable when plaintiff was terminated, and that it became unprofitable and closed because Winter, as plaintiff's replacement and one who resisted plaintiff's attempts to correct the pharmacy's problems, allowed the pharmacy to revert to its earlier state of benign neglect.

B.     Analysis

We agree with Dignity that the award of economic damages is unsupported. The undisputed expert testimony is that the period for which plaintiff could recover economic damages ended when the outpatient pharmacy closed in March 2016 if at that time there was no other opportunity for plaintiff to maintain similar employment with Dignity. There is no dispute the pharmacy closed on March 1, 2016, and plaintiff directs us to no

49

evidence in the record showing other comparable positions for her were available within the Dignity system. Her citations to the record in support of her argument address other matters. The only evidence on point indicates such positions were not available. Thus, the award for economic damages for any time after the pharmacy closed is unsupported and excessive.

Plaintiff argues that Dignity's stated reason for closing the pharmacy due to its becoming unprofitable is not supported by the evidence. She asserts the pharmacy closed because its license expired, which was the avoidable consequence of running the pharmacy poorly and led to the pharmacy losing government funding for certain medications and being unable to take Medicare patients. Plaintiff claims the evidence shows the pharmacy would have been brought into compliance, and presumably remained open, had Dignity not wrongfully terminated her.

Plaintiff's citations to the record do not support her assertion. The evidence indicates the pharmacy closed because of Dignity's decision not to participate in the government funding program and changes made to that program, not because Dignity lost that funding due to problems with the pharmacy which plaintiff attempted to fix. When plaintiff began working for Dignity, the pharmacy participated in a federal government program known as 340B where the government discounted the pharmacy's wholesale price for purchasing medications if the pharmacy served a certain percentage of low-income persons. Plaintiff testified the pharmacy stopped participating in the program in January 2015. Foreman told plaintiff and others the pharmacy was not going to participate in the program because it required a lot of auditing, and it was a matter that could affect her license. She was doing a lot of other audits for the inpatient pharmacy and did not want to deal with that.

Dignity's license to operate the outpatient pharmacy expired on March 1, 2016. Dignity did not renew the license because it was closing the pharmacy. In an email to the outpatient clinic's staff, Patel stated that closing the pharmacy was a financial decision

50

due to significant reductions in the reimbursements available through the 340B program, rendering the pharmacy no longer sustainable. None of this evidence indicates Dignity lost the 340B program funding because of problems with the pharmacy that plaintiff was addressing.

Also, contrary to the trial court's ruling, it is not logical to conclude based on this evidence that the pharmacy became unprofitable due to how Winter oversaw the pharmacy after plaintiff was terminated. The evidence indicates solely that the pharmacy became unprofitable because Dignity chose not to participate in the 340B program. And Dignity made that choice while it still employed plaintiff. Indeed, plaintiff testified that although the pharmacy was very profitable while it participated in the 340B program, it became less profitable during the last three months of her employment when the pharmacy was not participating in the program.

Plaintiff also states that Dignity retained Nijjar and Foreman after the pharmacy closed, suggesting that had Dignity not terminated her, she would have remained employed at Dignity. Plaintiff's citations to the record on this point do not support her argument and concern other matters. There is no dispute that plaintiff's position as outpatient pharmacy pharmacist-in-charge was eliminated when the pharmacy closed. Plaintiff's replacement was terminated. It is true that Foreman did not lose her job, but she oversaw the inpatient pharmacy, which did not close, and as of trial she continued to work as the director of pharmacy and pharmacist-in-charge of the inpatient pharmacy. As of the time of trial, Nijjar continued to work as a pharmacist at the Woodland hospital but in the inpatient pharmacy and not as the pharmacist-in-charge. That these two people continued their employment with Dignity in positions different from plaintiff's does not suggest plaintiff would have retained her position at Dignity had she not been terminated.

Plaintiff faults Dignity for not presenting its own expert evidence on the issue of economic damages. But Dignity did not bear the burden of establishing damages. And plaintiff ignores *her* expert witness's undisputed testimony that under the facts presented,

51

plaintiff's right to economic damages ended the day Dignity closed the outpatient pharmacy. Because the evidence does not support the award, we will reverse the jury's verdict and remand the matter for a new trial on the issue of economic damages.

VII

*Attorney Fees*

When determining liability under plaintiff's cause of action for discrimination in violation of FEHA, the jury found that plaintiff's Iranian national origin was a substantial motivating reason for Dignity's decision to terminate her. However, the jury also found that Dignity would have terminated plaintiff even if it had not considered her national origin. The jury did not award plaintiff damages under FEHA.

After trial, plaintiff moved for declaratory relief and a determination that she was eligible for attorney fees under FEHA. The trial court denied declaratory relief, but it granted the motion allowing plaintiff to seek attorney fees. It declared plaintiff to be the prevailing party for the purpose of her attorney fee petition under FEHA's attorney fee statute, Government Code section 12965, former subdivision (b), and *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*).

Dignity contends plaintiff is not entitled to attorney fees. It claims substantial evidence does not support the jury's finding that Dignity terminated plaintiff because she is Iranian. It also claims that, in any event, plaintiff was not a "prevailing party" for purposes of receiving attorney fees under FEHA.

A.      Fee award under section 1102.5

Plaintiff initially asserts that Dignity's argument is mooted by subdivision (j) of section 1102.5. That statute, enacted while this case was pending, authorizes a trial court to award attorney fees to a plaintiff who brings a successful retaliation action under section 1102.5. (§ 1102.5, subd. (j); Stats. 2020, ch. 344, § 2.)

52

Because we have concluded that sufficient evidence does not support the jury's verdicts under section 1102.5, even if subdivision (j) of that section applies retroactively, an issue we do not resolve, plaintiff would not qualify for attorney fees as her causes of action under section 1102.5 were not successful.

B      Evidence of discrimination as a substantial factor

Where a FEHA plaintiff proves that discrimination was a substantial factor motivating a termination decision, but the employer has shown it would have made the same decision in any event, the plaintiff is not entitled to an award of damages on the FEHA claim. (*Harris, supra*, 56 Cal.4th at p. 233.) However, the plaintiff may be eligible for reasonable attorney fees and costs. (*Id*. at pp. 234-235; Gov. Code, § 12965, subd. (c)(6) [formerly subdivision (b), see Stats. 2019, ch. 709, § 2; redesignated subdivision (c)(6) in Stats. 2021, ch. 278, § 7].)

Dignity contends plaintiff is not eligible for a fee award because substantial evidence does not support the jury's verdict that plaintiff's national origin was a substantial motivating factor in Dignity's decision to terminate her. Foreman took the lead in hiring plaintiff, so it is illogical to conclude she fired her five months later on discriminatory grounds. Dignity also claims that no evidence connects Foreman's anti-Iranian remarks to the discharge decision. Numerous individuals participated in the decision to terminate plaintiff, the least senior of which was Foreman. And there is no evidence the other persons knew Foreman had made any biased comments.

When the trial court denied the motion for new trial, it found that Foreman's remarks and circumstantial evidence supported the jury's finding. Plaintiff testified of how Foreman treated her and of Foreman's anti-Iranian comments. Plaintiff shared her concerns with Moradi, and Moradi replied that she had received anti-Iranian comments from Foreman. Most important to the trial court, the pharmacy had two Iranian

53

employees who complained about various aspects of the pharmacy to Foreman and both were reprimanded for what they said and did.

We agree with the trial court's determination. "[T]he existence of facts from which a jury could find that improper bias was a substantial factor motivating the employer's decision is sufficient to establish discriminatory conduct" in violation of FEHA. (*Harris, supra*, 56 Cal.4th at p. 229.)

Dignity contends no evidence connects Foreman's remarks to employment decision-making. It is correct that mere discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decision-making are not actionable under FEHA. (*Harris, supra*, 56 Cal.4th at p. 231.) " '[T]he plaintiff must produce evidence sufficient to show that an illegitimate criterion was a *substantial factor* in the particular employment decision. . . .' (*Price Waterhouse* [*v. Hopkins* (1989)] 490 U.S. [228,] 278 (conc. opn. of O'Connor, J.), italics added; [citation].) Requiring the plaintiff to show that discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor, more effectively ensures that liability will not be imposed based on evidence of mere thoughts or passing statements unrelated to the disputed employment decision. At the same time, . . . proof that discrimination was a *substantial* factor in an employment decision triggers the deterrent purpose of the FEHA and thus exposes the employer to liability, even if other factors would have led the employer to make the same decision at the time." (*Harris,* at p. 232.)

The evidence of Foreman's bias against Iranians consisted of more than just stray remarks unconnected to plaintiff's termination. In addition to Foreman's anti-Iranian statements, the evidence showed that Foreman treated plaintiff and Moradi different from the other employees. While she regularly criticized and admonished plaintiff and Moradi, she protected Plummer and others from plaintiff disciplining them for legitimate reasons. While Foreman and the others acted quickly and permanently against plaintiff upon learning of her two violations of company policy and the write-up of Nijjar, there is

no evidence she acted with similar commitment to protect the public against harm that could arise from the ongoing violation of rules and directives by Plummer, Winter, and others. Although numerous individuals participated in the decision to terminate plaintiff, the trial court found it was Foreman who drove the process. This was sufficient evidence to uphold the jury's finding that plaintiff's national origin was a substantial factor in Dignity's decision to terminate plaintiff.

C.  Prevailing party

Dignity argues that even if substantial evidence supports the jury's finding, plaintiff did not qualify as a prevailing party entitled to fees under FEHA. Citing *Harris*, Dignity contends that in a same-decision case such as this, where the jury finds discrimination but also that the employer would have terminated anyway, an award of attorney fees to the plaintiff is unavailable where the litigated claims served no public purpose " 'either because they have no broad public impact or because they are factually or legally weak.' " (*Harris, supra*, 56 Cal.4th at p. 235, quoting *Weeks v. Barker & McKenzie* (1998) 63 Cal.App.4th 1128, 1173.) Dignity asserts this action is one without public purpose. The verdict rested on a handful of comments by a non-policymaking employee, Foreman, and there is no evidence the remarks indicated a recurrent policy or practice of discrimination at Dignity.

Dignity reads the quoted language too narrowly. The *Harris* court made clear that disclosing and preventing discrimination in the workplace, even by a single lawsuit, has a broad public impact. The court explained at length: "[S]eparate and apart from its compensatory purpose, the FEHA aims 'to provide effective remedies that will . . . prevent and deter unlawful employment practices.' ([Gov. Code,] § 12920.5.) This forward-looking goal of preventing and deterring unlawful discrimination goes beyond the tort-like objective of compensating an aggrieved person for the effects of any wrongs done in an individual case. It is rooted in the Legislature's express recognition that

employment discrimination 'foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general.' ([Gov. Code,] § 12920.)  This broader purpose underlying the FEHA is also reflected in our recognition of 'the fundamental *public* interest in a workplace free from the pernicious influence of sexism.  So long as it exists, we are *all* demeaned.'  (*Rojo v. Kliger* [(1990)] 52 Cal.3d [65,] 90, original italics.)"  (*Harris, supra*, 56 Cal.4th at p. 225.)

"[T]he existence of facts from which a jury could find that improper bias was a substantial factor motivating the employer's decision is sufficient to establish discriminatory conduct that 'foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general.' ([Gov. Code,] § 12920.)  Such discrimination, even if not a 'but for' cause of the disputed employment action, would breed discord and resentment in the workplace if allowed to be committed with impunity."  (*Harris, supra*, 56 Cal.4th at pp. 229-230.)

"[T]he Legislature expressly sought to '*prevent* and *deter* unlawful employment practices' ([Gov. Code,] § 12920.5, italics added)—in other words, to keep unlawful practices from happening in the first place.  When discrimination has been shown to be a substantial factor motivating an employment action, a declaration of its illegality serves to prevent that discriminatory practice from becoming a 'but for' cause of some other employment action going forward."  (*Harris, supra*, 56 Cal.4th at p. 230.)

"When a plaintiff has shown that an employment decision has been substantially motivated by discrimination, its harms cannot be assessed solely by reference to its consequences for that individual.  As we have said, the public policy against employment discrimination ' "inures to the benefit of the *public at large* rather than to a particular employer or employee." [Citation.]'  (*Rojo v. Kliger, supra*, 52 Cal.3d at p. 90, italics

added.)  It was precisely to address these wide-ranging harms that the Legislature recognized through the FEHA 'the fundamental public interest in a workplace free from the pernicious influence of [discrimination].'  (*Ibid.*)"  (*Harris, supra*, 56 Cal.4th at pp. 230-231.)

Plaintiff's proof of discrimination in Dignity's workplace met these public goals.

The language Dignity quotes from *Harris* requiring fee awards to serve a public purpose refers to the factors a trial court must consider in determining the amount of the fee award *after* exercising its discretion to award fees.  The paragraph from which Dignity quotes reads in its entirety, "An award of attorney's fees is discretionary under section 12965, subdivision (b).  An *award* may take into account the scale of the plaintiff's success, and it must not encourage 'unnecessary litigation of claims that serve no public purpose either because they have no broad public impact or because they are factually or legally weak.'  [Citation.]  Like Congress in enacting Title VII, our Legislature did not ' "enact[ ] legislation whose benefit inures primarily to lawyers in the form of a substantial fee recovery, even if relief to the plaintiff is otherwise trivial and the lawsuit promotes few public goals." '  (*Stevens v. Gravette Medical Center Hospital* (W.D.Ark.1998) 998 F.Supp. 1011, 1018.)  The touchstone is 'reasonable[ness].'  ([Gov. Code,] § 12965, subd. (b).)  In sum, we hold that a plaintiff subject to an adverse employment decision in which discrimination was a substantial motivating factor [but which the employer would have made absent the discrimination] may be eligible for reasonable attorney's fees and costs expended for the purpose of redressing, preventing, or deterring that discrimination." (*Harris, supra*, 56Cal.4th at p. 235, italics added.)

The trial court did not abuse its discretion in granting plaintiff attorney fees under FEHA.  We have no doubt the trial court will exercise its discretion in determining the fee amount fully consistent with *Harris* and other relevant authorities.

DISPOSITION

The judgment is reversed in part and affirmed in part. The judgments in favor of plaintiff on her causes of action under Labor Code section 1102.5, subdivisions (b) and (c) are reversed, and we direct judgment be entered in Dignity's favor on those causes of action. The judgment in favor of plaintiff on her cause of action for wrongful discharge in violation of public policy is affirmed.

The awards of punitive damages and compensatory damages are reversed. The award of attorney fees is affirmed. The matter is remanded with directions to hold a new trial on the issue of compensatory damages only.

The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

 

 

 

 

HULL, Acting P. J.

 

We concur:

 

 

DUARTE, J.

 

 

HOCH, J.*

 

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.